UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

CHRISTOPHER FUQUA,           )
                             )
            Plaintiff        )
                             )
    vs.                      )     Case No.   3:16-cv-01510-HNJ
                             )
R. MARSHALL HESS,            )
                             )
            Defendant        )

## MEMORANDUM OPINION AND ORDER

This action proceeds on Defendant R. Marshall Hess's Motion for Summary Judgment on Plaintiff Christopher Fuqua's 42 U.S.C. § 1983 unlawful seizure, false arrest, and excessive force claims pursuant to the Fourth Amendment to the United States Constitution, and state law claims of false arrest, false imprisonment, and assault and battery.   Hess prevails on Fuqua's Fourth Amendment unlawful seizure and false arrest claims, yet genuine issues of material fact preclude summary judgment on the Fourth Amendment excessive force claim.   Furthermore, state-agent immunity bars Fuqua's false arrest and false imprisonment claims, yet genuine issues of material fact regarding the assault and battery claim preclude summary judgment.

Therefore, for the reasons set out herein the court **GRANTS** in part and **DENIES** in part Defendant Hess's motion.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is,

by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, the court may grant summary judgment. *Anderson*, 477 U.S. at 249. That is, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence." *Id.* at 250.

## FACTS[1]

On the afternoon of September 13, 2014, Plaintiff Christopher Fuqua and his pregnant girlfriend, Luphelia McDade, hosted a football-watching party at their residence in Sheffield, Alabama. (Doc. 43-1, Fuqua Dep. ("Fuqua Dep."), at 42; Doc. 45-2, McDade Dep. ("McDade Dep."), at 32-33).[2] Fuqua's sister, Tiffany Fuqua, attended the party with three children: two teenaged daughters, approximately 15 and

---

[1] Pursuant to the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party.

Furthermore, the court entered an order contemporaneously with this opinion declining to deem admitted Defendant's Requests for Admissions due to Plaintiff's tardy responses thereto. Therefore, the facts reviewed herein do not emanate from the Plaintiff's supposed admissions regarding the Requests for Admissions.

[2] The court cites to deposition page numbers rather than CM/ECF document page numbers.

16 years old at the time, and a five-year-old offspring. (Doc. 45-3, T. Fuqua Dep. ("T. Fuqua Dep."), at 10-13). At some point, McDade left and returned home with groceries, and Fuqua and the guests assisted in taking the groceries inside the home. (McDade Dep. at 34-35, 36, 38, 40, 172; Fuqua Dep. at 55, 61; T. Fuqua Dep. at 17-18, 20-21).

Contemporaneously with the foregoing events, Fuqua's neighbor approximately 404 feet away, Dustin Tyler Roberts, observed and heard from his front porch what he interpreted as an altercation at Fuqua's home.[3] (Doc. 43-5, Roberts Decl.). He

---

[3] Fuqua resided at 701 Milner Street and Roberts resided at 808 Milner Street. (Doc. 43-5, Roberts Decl., ¶ 3; Fuqua Dep. at 40).



described a vehicle with approximately three African-American women arrive at the home, and then the women proceeded inside. (*Id.*, ¶ 3). Subsequently, he perceived the women exit the home and apparently engage in an argument with Fuqua and McDade. Roberts heard shouting, and the close proximity of the people to each other contributed to his belief a fight occurred. (*Id.*, ¶ 4). Roberts called 911 and reported a domestic dispute involving a pregnant woman at a house with a black Chevrolet truck and a Chrysler Pacifica parked outside. (*Id.*, ¶ 5). Roberts's description matched Fuqua's home. (Doc. 43-4, Hess Decl. (Hess Decl.'), ¶ 3; Doc. 43-3, Cantrell Dep. ("Cantrell Dep."), at 14-15).

During or shortly after Roberts's 911 call, Fuqua went to his truck to retrieve some cigarettes. (Fuqua Dep. at 55, 61-62, 91, 101). City of Sheffield Officers R. Marshall Hess and Regina Cantrell received the 911 dispatch call and proceeded to Fuqua's residence. (Doc. 43-2, Hess Dep. ("Hess Dep.), at 12, 14; Hess Decl., ¶ 2; Cantrell Dep. at 7-8). They encountered Fuqua next to his truck with a door open. (Hess Dep. at 22; Hess Decl., ¶ 3; Cantrell Dep. at 10-11; Fuqua Dep. at 100-01, 114).

The officers informed Fuqua about the 911 call regarding the supposed altercation.[4] (Hess Dep. at 25; Cantrell Dep. at 15; Fuqua Dep. at 91-92, 170). Fuqua

---

[4] According to the Alabama Uniform Incident/Offense Report Hess prepared, he believed Fuqua intended to depart the premises in the truck. (Doc. 43-6 at 10; Doc. 43-7 at 11).

denied any knowledge of a confrontation.[5] (Hess Dep. at 25, 78, 127; Cantrell Dep. at 21; Fuqua Dep. at 92, 120, 199, 207). Hess then asked Fuqua for his name and identification. (Cantrell Dep. at 22). Fuqua gave his name[6] and informed the officers his identification was in his home. (Fuqua Dep. at 90, 92, 93, 99, 193; Cantrell Dep. at 27, 101). As he turned and walked towards his home, Fuqua again denied any knowledge about an altercation.[7] (Cantrell Dep. at 21; Fuqua Dep. at 168). Fuqua admits that during these events, he was angry, he raised his voice, and he used profanity, yet he denies cursing specifically at Hess or that he was aggressive or threatening. (Fuqua Dep. at 94, 95, 106, 120-21, 155, 156, 171-72, 179-80).

At some point, at either Fuqua's request or the children's behest, McDade and Tiffany came onto the home's porch to observe the encounter. (Fuqua Dep. at 6, 91, 94, 103, 104, 107, 180-81; McDade Dep. at 49, 60; T. Fuqua Dep. at 21-22). Tiffany observed Fuqua walking toward the home with Hess close behind or at his side. (T. Fuqua Dep. at 23, 25, 27, 58). She recounted Fuqua stating repeatedly he had not done anything. (T. Fuqua Dep. at 23-24, 25). Tiffany does not recall Hess responding. (T.

---

[5] Hess declares Fuqua responded to the question with profanity and a raised voice. (Hess Dep. at 28, 29, 127). Roberts declares he viewed the interaction from his porch, and Fuqua appeared to argue with the officers and act in an agitated manner. (Roberts Decl., ¶ 5).

[6] Hess and Cantrell testified Fuqua did not provide his name; rather, they said Fuqua remarked he did not have to do so. (Hess Dep. at 30; Cantrell Dep. at 15, 21, 116-17, 119).

[7] The officers testified Fuqua merely informed them he did not have anything to talk about and was going to proceed into his home as he began walking towards the dwelling. (Hess Dep. at 29, 78, 127, Hess Decl., ¶¶ 4, 5; Cantrell Dep. at 21).

Fuqua Dep. at 25). McDade described a confused look on Fuqua's face rather than anger. (McDade Dep. at 64-65, 82, 155-56). McDade recalls Fuqua possibly expressing his belief he was going to jail, although Hess had not informed him he was under arrest. (McDade Dep. at 76; Hess Dep. at 61, 100). Fuqua testified he believed he was going to jail and told McDade so, though, again, Hess had made no specific statement to that effect. (Fuqua Dep. at 94, 104, 105, 106, 116, 117, 119, 170).

At some point, Hess grasped Fuqua on the shoulder and instructed him to stop walking. (Hess Dep. at 40; Fuqua Dep. at 94, 95-96, 100, 103). Fuqua stopped when Hess placed his hand on his shoulder, and he then turned and talked to Hess, without aggression or clenched fists.[8] (Fuqua Dep. at 100, 114, 115, 116, 121-22, 123, 179). Fuqua instructed Tiffany to record the encounter, prompting Tiffany to return inside the home and retrieve her mobile telephone to record the events. (Fuqua Dep. at 100, 107, 117, 125; T. Fuqua Dep. at 26; McDade Dep. at 83, 167). Upon the door closing behind her, Hess deployed his taser against Fuqua, without warning and without first asking Fuqua to place his hands behind his back. (Fuqua Dep. at 100, 118, 119-20, 125, 171; McDade Dep. at 77). Neither Tiffany nor McDade recall Hess saying anything,

---

[8] The officers attest that upon Hess placing his hand upon the shoulder, Fuqua turned toward Hess, adopted an aggressive stance with clenched fists, and continued cursing loudly and repeatedly. (Hess Dep. at 43, 44, 130, 133, 134, 137, 141, 161; Cantrell Dep. at 29-30, 75, 82, 85-86, 87, 96, 99, 101, 118; Hess Decl., ¶ 8). The officers also testified that Fuqua refused commands to place his hands behind his back. (Hess Dep. at 56, 57, 57, 58, 60; Cantrell Dep. at 97; Hess Decl., ¶ 9). Roberts declared that from his viewpoint on his front porch, Fuqua did not appear to be following the officers' instructions. (Roberts Decl., ¶ 5).

such as a directive, warning, etc., before he tased Fuqua the first time.[9] (T. Fuqua Dep. at 25; McDade Dep. at 93-94). The taser struck Fuqua on the side of his chest, and he dropped to his knees. (Fuqua Dep. at 125, 127, 135; McDade Dep. at 77, 82, 84, 121, 160, 166; Doc. 43-9 at 20, 22).

Tiffany returned and captured two recordings of the incident, both of which chronicled events after the afore-mentioned tasing.[10] The first recording establishes Fuqua's repeated use of profanity in a raised voice.[11] The audio recording also establishes Hess and Cantrell commanded Fuqua to roll over several times. Tiffany also recalled hearing the officers instruct Fuqua to roll over. (T. Fuqua Dep. at 50). Fuqua objected to rolling over onto the taser barbs, which remained lodged in his chest.[12] (Fuqua Dep. at 125, 135, 172, 173). Hess then tased Fuqua a second time.[13]

[9] According to the officers, after Hess grabbed the shoulder Fuqua pulled away at some point and walked backwards several steps toward the home, explaining his identification was in the home. (Cantrell Dep. at 23, 26, 27, 93-94, 99, 100, 101, 119; Hess Dep. at 29, 40, 127). They also testified Fuqua in this movement assumed an aggressive stance, with fists clenched, and cursed profusely. (Cantrell Dep. at 29-30, 75, 82, 86, 87, 96, 118; Hess Dep. at 43, 44, 130, 133, 134, 137, 141, 161; Hess Decl., ¶ 8)

[10] The recordings contain audio of the confrontation; however, the video portion primarily shows Tiffany's face during the incident and displays only a split second of the interaction between Fuqua and the officers. The first recording begins at 15:27:58 and lasts 47 seconds. The second recording begins at 15:29:23, approximately 38 seconds later, after the arrest and second tasing, and consists primarily of interaction between Cantrell and Fuqua's family members.

[11] The officers testified the incident drew people out of their homes. (Cantrell Dep. at 48, 78; Hess Dep. at 63-64). However, Fuqua and McDade testified only one home close to their residence contained inhabitants. (Fuqua Dep. at 84, 11, 177; McDade Dep. at 81, 134-35).

[12] Hess testified Fuqua attempted to stand up at this time, which Fuqua, Tiffany, and McDade dispute. (Hess Dep. at 68, 123; Fuqua Dep. at 125, 126, 135; T. Fuqua Dep. at 50; McDade Dep. at 109, 121,

Fuqua ended on his stomach, with his hands behind his back for handcuffing.[14] (Fuqua Dep. at 126, 135; Hess Dep. at 70, 94, 98, 117).

Hess then pulled Fuqua to his feet and escorted him to a patrol car. Fuqua testified the tasings rendered his gait wobbly. (Fuqua Dep. at 126). Hess pulled out a stun gun to tase Fuqua a third time due to perceived noncompliance in walking, but Fuqua told him there was no need to use it because he would comply with Hess's instructions. (Fuqua Dep. at 127, 128-29). Tiffany and McDade testified Hess deployed the taser a third time in an effort to compel Fuqua to walk correctly as they proceeded to the patrol car. (T. Fuqua Dep. at 52-53, 54, 65, 69; McDade Dep. at 127, 128, 129-30, 168-69, 176, 177, 180, 182). However, the taser did not deliver a charge.[15] (T. Fuqua Dep. at 52-53, 54, 65, 70, 71; McDade Dep. at 127, 182). Fuqua testified Hess tased him only twice during the entire incident. (Fuqua Dep. at 23, 134).

---

126, 127, 160, 166, 182).

[13] Cantrell testified she had her hands on Fuqua at that point and would have felt the shock had the taser operated correctly, contradicting Fuqua and Hess's testimony that the taser fired correctly. Cantrell opines a taser wire may have broken in the struggle to turn Fuqua over and place handcuffs on him. (Cantrell Dep. at 38, 60, 67, 79-80).

[14] Fuqua denies Hess instructed him to roll over; rather, he avers he rolled over voluntarily after Hess deployed his taser the second time. (Fuqua Dep. at 126, 135).

[15] Cantrell testified that while Hess escorted Fuqua to the patrol car, a cursing Fuqua attempted to pull away and turn around. (Cantrell Dep. at 39-40). At that point, Cantrell heard Hess activate the taser, yet she testified it did not affect Fuqua. (Cantrell Dep. at 44, 60).

In subsequent judicial proceedings, the Sheffield municipal court convicted Fuqua of disorderly conduct and resisting arrest on January 7, 2015. (Doc. 43-6 at 8; Doc. 43-7 at 8). Fuqua appealed to the Colbert County Circuit Court, which dismissed the charges on the City of Sheffield's motion on June 8, 2015. (Doc. 43-6 at 26; Doc. 43-7 at 18).

Fuqua testified that he encountered Hess approximately two months before the incident in question, at a convenience store. Hess approached Fuqua about leaving a child in a car outside the store and gave him a warning. Fuqua claimed Hess told him to stay out of Sheffield. (Fuqua Dep. at 71-74). Hess recalled talking to Fuqua at a convenience store and giving him a verbal warning about illegally parking in an alleyway. (Hess Dep. at 33-34, 36).

## ANALYSIS

As stated previously, Fuqua claims Hess violated his Fourth Amendment right to be free from unlawful seizures, false arrests, and excessive force. Hess argues he deserves qualified immunity from Fuqua's claims. As the following analyses portray, Hess garners qualified immunity on the unlawful seizure and false arrest claims, yet genuine, disputable issues of material fact preclude summary judgment on Fuqua's excessive force claim.

Qualified immunity protects government officials performing discretionary functions in their individual capacity from civil suit and liability "insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a court concludes the defendant was engaged in a discretionary function, "'the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Hill*, 797 F.3d at 978 (citation omitted). There exists no dispute Hess performed discretionary functions in these circumstances, so Fuqua bears the burden of persuasion on the balance of the qualified immunity inquiry: Hess violated a constitutional right, and the right was clearly established at the time of the alleged violation. *Id.* (citation omitted). Courts retain discretion to adjudicate one prong without addressing the other. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The court will first determine whether Hess violated any of Fuqua's constitutional rights. Examining whether Hess violated a constitutional right rests upon the standards applicable to the substantive doctrine at issue. In assessing qualified immunity, a court may not resolve genuine disputes of fact in favor of the party seeking summary judgment.

Applying the foregoing concepts demonstrates Fuqua may proceed under § 1983 only as to his excessive force claim.

## I.    Hess Possessed Reasonable Suspicion to Initially Stop Fuqua

Fuqua's Fourth Amendment unlawful seizure claim rests upon Hess's initial stop and detention in Fuqua's front yard.  The Fourth Amendment protects people against unreasonable searches and seizures.  A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (citations and emphasis omitted).  The Supreme Court delineates at least three categories of police-citizen encounters meriting different levels of Fourth Amendment scrutiny: "(1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny . . .; (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied . . .; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny . . . ."  *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (citations omitted).

There exists no dispute Hess seized Fuqua during the encounter in the yard, as Hess stopped Fuqua to question him about the reported domestic disturbance, and he grasped Fuqua's shoulder to prevent him from proceeding into his home.  The inquiry ensues whether these initial seizures, which manifest as investigative stops short of arrest, were unreasonable.

The inquiry proceeds under the reasonable suspicion standard. The standard established in *Terry v. Ohio* permits officers to detain citizens briefly to investigate "a reasonable suspicion that such persons are involved in criminal activity." *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) ("if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."). Reasonable suspicion exists as a "commonsense, nontechnical conception" for examining "the factual and practical considerations of everyday life on which reasonable and prudent" persons, "not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citations omitted). As a "fluid concept[]" that gathers "substantive content from the particular context[] in which the standard[]" is assessed, "one determination [under the reasonable suspicion standard] will seldom be a useful precedent for another." *Id.* at 696, 698 (citations omitted).

Nevertheless, courts have divined some precepts for the *Terry* standard. "Although the reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (citing, *inter alia*, *United States v. Arvizu*, 534 U.S. 266, 274, (2002))

14

(other citations and internal alterations omitted). "The officer's reasonable suspicion must be based on 'specific articulable facts, together with rational inferences from those facts.'" *Id.* (citation omitted).

Courts must review the "totality of the circumstances" to determine whether an officer possessed "a particularized and objective basis for suspecting legal wrongdoing." *Id.* (quoting *Arvizu*, 534 U.S. at 273). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quoting *Arvizu*, 534 U.S. at 273); *see also United States v. Reed*, 402 F. App'x 413, 415 (11th Cir. 2010) ("Reasonable suspicion analysis is not concerned with 'hard certainties, but with probabilities . . . .' '[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.'") (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Moreover, "[r]easonable suspicion is determined from the . . . collective knowledge of all the officers involved in the stop." *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (citations and internal quotation marks omitted).

In this case, the 911 call provided information indicating a possible domestic dispute and sufficiently described Fuqua's residence and the vehicles parked outside. Therefore, on these undisputed facts no reasonable juror could deny the officers possessed adequate, reasonable suspicion to initiate contact with Fuqua to conduct an

investigation. *See Navarette v. California*, 572 U.S. 393, 403-04 (2014) (911 call claiming eyewitness knowledge of alleged illegal activity gave police reasonable suspicion to perform investigative stop); *Terry*, 392 U.S. at 22 ("a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest"); *United States v. Sanders*, 394 F. App'x 547, 549 (11th Cir. 2010) (officers' corroboration of anonymous 911 call created reasonable, articulable suspicion to detain suspect for an investigatory stop). Therefore, Hess deserves qualified immunity and summary judgment on the unlawful seizure claim.

## II. Hess Possessed Probable Cause to Question and Arrest Fuqua

Fuqua's second Fourth Amendment claim avers Hess perpetrated a false arrest under the circumstances of this case. An arrest without probable cause constitutes an unreasonable seizure that violates the Fourth Amendment. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Conversely, an arrest buttressed by probable cause constitutes an absolute bar to a Fourth Amendment claim for false arrest. *See Gurrera v. Palm Beach Cnty. Sheriff's Office*, 657 F. App'x 886, 889 (11th Cir. 2016) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)); *Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009). Therefore, to preclude qualified immunity on a false arrest claim, a plaintiff must "show a lack of probable cause" for the arrest. *Gurrera*, 657 F. App'x at 889 (citation omitted).

Law enforcement officers may effect warrantless arrests "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). "Probable cause exists when 'the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense.'" *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006) (citing *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). For probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances," *Bailey v. Board of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1119 (11th Cir. 1992), and an officer's subjective intentions play no role in determining the existence of probable cause. *See Rankin*, 133 F.3d at 1433-34.

The "substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted); *see also United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) ("Probable cause in this context is a 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion—the same standard used to determine the legality of arrests, searches, and seizures in criminal law.'") (citations omitted). "All we have required is the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citations and internal

alterations omitted). Although "not a high bar," probable cause "requires . . . a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).

Indeed, in qualified immunity determinations, assessing probable cause commands a relaxed assessment. To obtain qualified immunity on a Fourth Amendment unlawful seizure claim, an officer need only sustain "arguable" probable cause, not actual probable cause. *Brown*, 608 F.3d at 735. Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as [a defendant] could have believed that probable cause existed to arrest [a § 1983 complainant]." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) (quotation marks omitted). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (quotation marks and ellipses omitted).

Assessing arguable probable cause rests upon the elements of the alleged crime and the operative fact pattern. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007); *Crosby v. Monroe Cnty., Ala.*, 394 F.3d 1328, 1333 (11th Cir. 2004). However, determining arguable probable cause does not require proof of every element of a crime. *Brown*, 608 F.3d at 735; *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir.

2001). If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply. *Skop*, 485 F.3d at 1138.

The authorities charged Fuqua with disorderly conduct based upon the circumstances that prevailed in the front yard. Alabama law defines disorderly conduct in pertinent part as follows:

> (a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he or she does any of the following: . . .
>
> (2) Makes unreasonable noise. . . .

Ala. Code § 13A-11-7(a).

Several court decisions delineate circumstances where probable cause exists to effect a disorderly conduct arrest for making an unreasonable noise. *See Redd v. City of Enterprise*, 140 F.3d 1378, 1382–83 & n.4 (11th Cir. 1998) (officers had probable cause to arrest plaintiff for unreasonable noise based upon plaintiff's admission he attempted to be heard over traffic and spoke loudly enough to be heard across the street, and passers-by complained of the loudness); *Windham v. City of Fairhope*, 597 F. App'x 1068, 1072 (11th Cir. 2015) (plaintiff's repeated yelling at officers and to truck driver on a busy road, even if ultimately insufficient to sustain a conviction under the statute, provided arguable probable cause for officers to arrest her for disorderly conduct by making unreasonable noise); *Lewis v. Blue*, 774 F. Supp. 2d 1164, 1180–81 (M.D. Ala. 2011) (arguable probable cause that plaintiff violated disorderly conduct statute by "recklessly

creating a risk" of "public annoyance" by "making unreasonable noise"; although plaintiff was on private property, she admitted she was loud in the use of "profane language that could also be heard on the street, by neighbors, and by anybody passing by"); *Hutchins v. City of Alexander City*, 822 So.2d 459, 461–62 (Ala. Crim. App. 2000) (affirming a defendant's disorderly conduct conviction pursuant to the unreasonable noise prong based upon his screaming in a police station); *Sterling v. State*, 701 So. 2d 71 (Ala. Crim. App. 1997) (probable cause supporting a disorderly conduct arrest existed when a defendant in a courthouse made unreasonable noise by loudly asking why the sheriff had denied defendant's application for a pistol permit.); *c.f. Walker v. Briley*, 140 F. Supp. 2d 1249 (N.D. Ala. 2001) (fact issues existed as to probable cause for disorderly conduct arrest where plaintiff denied being loud or using profanity).

Based upon the preceding caselaw and the undisputed facts reviewed previously in the light most favorable to Fuqua, no reasonable juror can find Hess lacked arguable probable cause to arrest Fuqua for disorderly conduct by making unreasonable noise.[16]

---

[16] Fuqua argues the ultimate termination of the criminal proceedings in his favor establishes that Hess lacked probable cause to arrest him. In contrast, Hess contends Fuqua's conviction in the municipal court proceedings satisfies the probable cause requirement, notwithstanding that the charge was dismissed on appeal.

Hess basically relies upon the following principle discussed in the Restatement (Second) of Torts § 667(1): "the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means." Several pertinent decisions modify this principle: where a conviction in a lower tribunal is vacated or overturned on appeal, the conviction represents only *prima facie* evidence of probable cause, subject to a rebuttal by any competent evidence which clearly overcomes the presumption. *See Ex parte City of Gadsden*, 718 So.2d 716, 718 (Ala. 1998); *Gunter*

Fuqua admitted he was angry, raised his voice, and used profanity during the confrontation in his front yard. The officers corroborated Fuqua's admission, stating that he exhibited loud speech, cursing, and aggravation. A reasonable officer in the circumstances may believe that Fuqua recklessly created a risk of public inconvenience, annoyance, or alarm by making unreasonable noise. *See Ex parte Thomas*, 666 So. 2d 855, 857 (Ala. 1995) (probable cause for disorderly conduct arrest does not depend upon whether residence is located in an urban or rural area).

---

*v. Pemco Aeroplex, Inc.*, 646 So.2d 1332, 1333 (Ala. 1994); *Brown v. Parnell*, 386 So. 2d 1137 (Ala. 1980); *Johnston v. Byrd*, 279 Ala. 491, 494, 187 So. 2d 246, 249 (1966); *Jordan v. Wilson*, 83 So. 2d 340, 341 (1955); *Long v. Dietrich*, No. 1:10–cv–02859–HGD, 2012 WL 4478802 (N.D. Ala. Sept. 20, 2012); *Lawrence v. City of Fairhope*, No. 09-0050-WS-C, 2010 WL 1658786 (S.D. Ala. April 22, 2010); *Ruffino v. City of Hoover*, No. CV 08-B-0002-S, 2009 WL 10687946 (N.D. Ala. March 4, 2009).

Although it is not necessary to resolve the parties' dispute, the court notes that the presumption may not apply to this case's circumstances. The Restatement section and all of the afore-cited cases, save one, apply the presumption to complaints raising *malicious prosecution* claims, not false arrest claims.

This is appropriate, as the evidence garnered at trial on a criminal charge may not reflect the facts available to an officer effecting an arrest based upon arguable probable cause. Indeed, the presumption flatly contradicts Eleventh Circuit precedent, as the court unequivocally declares that evaluating whether an officer had arguable probable cause to arrest a plaintiff rests upon "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (quotation omitted). More recently, the Supreme Court unequivocally foreclosed use of the presumption for false arrest determinations. *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'") (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996))).

Because Hess had arguable probable cause to arrest Fuqua, the law affords Hess qualified immunity as to Fuqua's Fourth Amendment false arrest claim.[17]

## III. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Fourth Amendment Excessive Force Claim

Hess claims qualified immunity on Fuqua's Fourth Amendment excessive force claim. Based upon the genuine dispute of material facts whether Hess's tasing violated a clearly established constitutional right, the court will deny Hess summary judgment on this claim.

### A. A Reasonable Jury May Determine Hess Used Excessive Force

"'The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.'" *Glasscox v. City of Argo*, 903 F.3d 1207, 1213–14 (11th Cir. 2018) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). A court assesses the excessive force inquiry by determining "'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" *Id.* (citation omitted). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was

---

[17] The existence of arguable probable cause for at least one charge suffices to grant Hess qualified immunity on Fuqua's Fourth Amendment false arrest claim. *See Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002); *Whittington v. Town of Surfside*, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007), *aff'd*, 269 F. App'x 918 (11th Cir. 2008) ("[S]o long as probable cause existed to arrest Plaintiff for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses. . . .").

Nevertheless, arguable probable cause existed for the resisting arrest charge based upon Fuqua's conduct after the first tasing. His refusal to turn over and submit to handcuffing, regardless of his reasons for doing so, portrays probable cause for a resisting arrest charge.

objectively unreasonable"; a court does not take into account a defendant's state of mind. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). In conducting this examination, the court should evaluate "'(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (citations omitted); *see also Glasscox*, 903 F.3d at 1214 (applying same factors).

Analyzing Fuqua's claims pursuant to the foregoing standard, the court denies summary judgment because genuine issues of material fact exist whether Hess's first use of the taser was excessive. As for the first factor, the severity of the crime at issue, the evidence is nearly in equipoise on a summary judgment assessment, yet it prevails slightly in Fuqua's favor. The disorderly conduct by unreasonable noise offense

represents a relatively minor crime, as using profanity in a loud voice does not constitute a serious offense. *See Fils*, 647 F.3d at 1288 ("Disorderly conduct is not a serious offense.") (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)). Even "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force." *Fils*, 647 F.3d at 1288.

However, Hess responded to a domestic violence call at Fuqua's residence, which is an offense commanding a heightened degree of seriousness. Fuqua and his family members deny any domestic altercation occurred at the residence, yet Hess's caution in the assessment of such claims is reasonable given the dispatch he received about the circumstances. Nevertheless, Fuqua exhibited only disorderly conduct at the time of the first tasing, which represents a less serious offense as discussed previously.

The second factor assesses whether Fuqua posed an immediate threat to the officers' or others' safety. Although Fuqua admits he was angry and used a loud voice with profanity, he testified he did not curse at Hess. Fuqua declares he gave his name to Hess, and he asserts he did not refuse to produce identification; rather, he informed the officers he would have to retrieve his identification from his home. According to Fuqua and his family members, Fuqua was not aggressive or combative in his interaction with Hess, and he did not clench his fists. And, viewing the facts in the light most favorable to Fuqua, the officers did not provide any warning, directives, or declarations that he was under arrest, and thus, Fuqua did not disobey any orders.

24

Third, according to Fuqua's version of the circumstances, he did not resist arrest. As recounted, he believed the officers were going to arrest him, yet they had not said as much before Hess tased him. Fuqua stopped when Hess grabbed his shoulder, and he was not combative or aggressive upon Hess's grasp. Hess immediately tased Fuqua upon Fuqua's directive to his sister to retrieve her mobile telephone to record the events. These facts do not indicate Hess resisted arrest.

The conflicting allegations in this case create a genuine issue of material fact whether Fuqua was non-hostile, non-violent, and cooperative, or whether he acted hostile, belligerent, and uncooperative. If the former circumstances manifested, existing case law establishes Hess may have used excessive force in tasing Fuqua the first time; if the latter, Hess may have been justified in his use of a taser.

This conclusion comports with Eleventh Circuit caselaw on claims of excessive force. As the court held in *Fils*, "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." 647 F.3d at 1289. In *Fils*, as police officers arrested a suspect outside of a night club with a crowd of onlookers present, the plaintiff commented to an associate that "'they're overreacting, these motherfuckers are overreacting'—'they' presumably meaning the police." *Id.* at 1288. One of the defendant-officers approached the plaintiff; asked, "what you said, motherfucker?"; pulled out his taser; and tased the plaintiff with no verbal warning as the plaintiff was

25

backing up with his hands in the air.  *Id.*  The Court determined these circumstances warranted a trial on the claim, reasoning that "[o]ther cases confirm that non-violent suspects, accused of minor crimes, who have not resisted arrest . . . are victims of constitutional abuse when police used extreme force to subdue them."  *Id.* at 1289 (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (the defendant-officer used excessive force when he punched the plaintiff in the stomach while the plaintiff was handcuffed and not resisting arrest); *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919 (11th Cir. 2000) (the court held that the defendant-officer used excessive force when he released his police dog to attack the plaintiff, who was accused of a minor, non-violent offense, who had obeyed every police command, and who was lying still on the ground when the defendant-officer released his dog)).  The Court declared that although none of its cited cases involved tasers, it saw "no meaningful distinction under the[] circumstances."  *Fils*, 647 F.3d at 1289.

Hess argues that his initial deployment of the taser did not constitute excessive force, particularly highlighting the officers' testimony that Fuqua was combative, repeatedly cursed in a loud voice, clenched his fists, turned aggressively towards the officers, backed away from them, and disobeyed commands to place his hands behind his back.  Hess argues it was reasonable for him to conclude the use of a taser was necessary, given the foregoing facts as buttressed by the nature of the alleged domestic

26

violence, the lack of an opportunity to conduct a pat down, and the lack of knowledge whether other violent suspects occupied the dwelling.

The Supreme Court's decision in *Tolan v. Cotton*, 572 U.S. 650 (2014), sets forth the proper disposition as to the disputed issues of fact in this case. In *Tolan*, the Court reversed the affirmance of summary judgment dismissing the plaintiff's excessive force claim because the lower court "failed to view the evidence . . . in the light most favorable to [plaintiff] with respect to the central facts of this case." *Id.* at 657. "By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Id.* (citations omitted).

In *Tolan*, an officer pulled over plaintiff and his cousin in a vehicle the officer mistakenly believed was stolen because he had miskeyed the vehicle's license plate number into a database. The stop occurred in front of plaintiff's home, and his parents came outside and pleaded with the officers that they owned the vehicle and the home. Plaintiff and his cousin lay on the ground at the direction of the officer and plaintiff's father. The defendant-officer responded to the call, and the defendant's handling of plaintiff's mother resulted in a response that occasioned the defendant's shooting of plaintiff and the ensuing § 1983 lawsuit. *Id.* at 651-54.

The Court declared the lower court erred in resolving four factual disputes at summary judgment. First, the defendant asserted the home's front porch was dimly lit,

but plaintiff's father testified the light was illuminating and there existed motion-activated floodlights on the driveway. *Id.* at 657-58. Second, the defendant stated plaintiff's mother was very agitated and refused orders to keep calm and quiet, but the mother testified she was neither aggravated nor agitated. *Id.* at 658.

Third, the defendant testified the plaintiff was shouting and verbally threatening the defendant. Although all parties agree the plaintiff told the defendant, "get your fucking hands off my mom," the Court found "a jury could reasonably infer that his words, in context, did not amount to a statement of intent to inflict harm" because a "jury could well have concluded that a reasonable officer would have heard [the plaintiff's] words not as a threat, but as a son's plea not to continue any assault of his mother." *Id.* at 658, 659.

Finally, the defendant testified the plaintiff moved to intervene in the officer's altercation with the mother as he was in a crouch or in a charging position, but the plaintiff, corroborated by his mother, testified he was on his knees, did not jump up, and was not going anywhere. *Id.* at 659.

Based upon the foregoing disputed issues of fact, the Court reasoned "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id.* As acknowledged by the Court, witnesses for the parties in an excessive force case "come . . . with their own perceptions, recollections, and even potential biases. It is in part for

that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.* at 660. "By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.*

At this summary judgment stage of the case at bar, the court cannot give credence to Hess's evidence that Fuqua was aggressive, combative, and disobeyed commands, notwithstanding Fuqua's admitted loud cursing and anger. A reasonable jury may conclude that Fuqua's behavior did not constitute a threat to Hess, but rather as consternation regarding an impending arrest for a crime (domestic violence) that allegedly did not occur according to Fuqua and his family members. These circumstances substantially correspond to the circumstances in *Tolan* as to the court's proper resolution of the disputed issues of fact. "[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at 657.

As to the second tase, Hess prevails on his summary judgment argument. The officers repeatedly commanded Fuqua to roll over and lie down on the ground. Fuqua has stated he refused the command because of the presence of taser barbs in his chest. Therefore, the evidence portrays Fuqua failed to comply with the officers' commands, resulting in Hess's second tasing to gain compliance. Under these circumstances, the

court finds Hess's second use of the taser did not violate Fuqua's Fourth Amendment rights. *See Anthony v. Coffee Cnty.*, 579 F. App'x 760, 765 (11th Cir. 2014) (finding use of taser not excessive when plaintiff was uncooperative by refusing to turn and place his hands behind his back).

### B. Clearly Established Law Proscribed Hess's Alleged Excessive Force

As foreshadowed in the previous section, clearly established law proscribes Hess's tasing of Fuqua under the alleged circumstances. Determining whether a constitutional right was clearly established may proceed in three guises. A right may be clearly established by "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Hill*, 797 F.3d at 979 (citation omitted). Under the second, afore-cited method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (citation omitted).

The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, No. 17-1660, 2019 WL 113027, at *2 (U.S. Jan. 7, 2019) (per curiam). "'Use of excessive force is an area of the law in which the result depends very much on

the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. . . . An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Kisela v. Hughes*, 584 U.S. ___, ___, 138 S. Ct. 1148, 1153 (2018) (per curiam)).

A right is clearly established if a defendant acted on "fair warning" that his conduct violated the constitutional rights of the plaintiff. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)). As elaborated, "fair warning" may emanate either from factually similar case law or where the right is one of 'obvious clarity'- i.e., where the officer's conduct "lies so obviously at the very core of what the [constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)). To establish the narrow obvious-clarity exception, "a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Glasscox*, 903 F.3d at 1218 (citation omitted). "This test entails determining whether application of the excessive force standard would inevitably lead every reasonable officer in the

Defendants' position to conclude the force was unlawful." *Id.* at 1218 (citation omitted).

In determining whether a right was clearly established, the court refers to binding decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the relevant state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11ᵗʰ Cir. 2007); *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11ᵗʰ Cir. 2003).

As presaged, *Fils*, a 2011 case, provided clearly established law placing Hess on fair notice that the alleged excessive force violated the Fourth Amendment. As the Eleventh Circuit explained, clearly-established caselaw prohibited the use of a taser when the suspect "committed at most a minor offense; . . . did not resist arrest; . . . did not threaten anyone; and . . . did not disobey any instructions (for none were given)." *Fils*, 647 F.3d at 1292. The *Fils* decision relied upon two prior cases for its proposition, finding that, although not identical, or even "materially similar," they provided fair warning "such force is excessive where the suspect is non-violent and has not resisted arrest." *Id.* (citing *Priester*, 208 F.3d at 927 (in a case where plaintiff-suspect had allegedly burglarized a dwelling, "the defendant-officer set his attack dog on the plaintiff even though the plaintiff had submitted to the defendant-officer's every command and was laying flat on the ground"); *Vinyard*, 311 F.3d at 1347-48 (plaintiff verbally accosted officer with insults and screaming, and "the defendant-officer sprayed pepper spray into

the eyes of [the] non-violent plaintiff, who was handcuffed safely in the back seat of the defendant-officer's police car, and had threatened no one.")).

Furthermore, the *Fils* decision held that the circumstances merited the "obvious clarity" exception of the clearly-established analysis. Accepting the facts as true, the Court determined the line was not hazy, as the plaintiff "showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures. Assuming these facts, no reasonable officer could ever believe that it was appropriate to shoot taser probes into" the plaintiff. *Fils*, 647 F.3d at 1292.

The same result manifests in this case on the clearly-established analysis. Taking the facts in the light most favorable to Plaintiff, Hess tased Fuqua the first time unprovoked, as Fuqua did not resist arrest, did not threaten anyone, did not disobey any instructions, and committed the minor offense of disorderly conduct by unreasonable noise. True, genuine disputes of material fact sharply divide the parties on the foregoing description, and if the officers' proffered facts are true, Hess merits judgment in his favor. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (an officer reasonably deploys a taser against a "hostile, belligerent, and uncooperative" suspect during a "difficult, tense and uncertain situation"); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (officers may tase an arrestee when they reasonably believe the suspect intentionally sprayed blood from his mouth onto them); *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008) (the use of a taser to effect an arrest does not constitute

excessive force when a subject is actively resisting arrest). Yet the ultimate resolution of the disputed facts must occur at trial, not at this summary judgment stage of the proceedings when the court must take Fuqua's facts as true. *Tolan*, 572 U.S. at 657 ("courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.").

For the foregoing reasons, the court denies summary judgment on Plaintiff Fuqua's Fourth Amendment excessive force claim against Defendant Hess.

## IV. State Agent Immunity Bars Fuqua's State Law Claims for False Arrest and False Imprisonment, But Not for Assault and Battery

Hess contends state agent immunity bars liability for Fuqua's state law claims for false arrest, false imprisonment, and assault and battery. The court finds Hess's argument bears merit as to the false arrest and false imprisonment claims, but not the assault and battery claim.

Under Alabama law, Hess, as a city police officer, enjoys immunity from tort liability "arising out of his [ ] conduct or performance of any discretionary function within the line and scope of his [ ] law enforcement duties." Ala. § 6–5–338(a). The Alabama Supreme Court described this immunity doctrine in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), and later revised it in *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006). In relevant part:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is

34

based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975.

*Hollis*, 950 So.2d at 309. However, "a State-agent shall not be immune from civil liability" in his individual capacity either: (1) when required by law; or (2) "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So.2d at 405.

Courts employ a burden-shifting analysis when determining whether state-agent immunity applies. *Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003). The peace officer initially bears the burden of establishing a plaintiff's "claims arise from a function that would entitle [the defendant] to immunity." *Id.*; *see also Walker v. City of Huntsville*, 62 So. 3d 474, 496-98 (Ala. 2010). To carry that burden, a defendant must establish (i) he or she was a peace officer on the date of the incident in question (ii) performing law enforcement duties at the time of the circumstances in question and (iii) exercising judgment or discretion when doing so. *Howard*, 887 So. 2d at 204. "The burden then shifts to the plaintiff to show that one of the two categories of exceptions . . . recognized in *Cranman* is applicable." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008).

For all of the state law claims, there exists no dispute as to the first element as Hess qualifies as a "peace officer." *See Borders v. City of Huntsville*, 875 So.2d 1168, 1178

(Ala. 2003) ("As a police officer, [the defendant] qualifies as a peace officer for purposes of [discretionary-function immunity]."); *Howard*, 887 So.2d at 204 ("It is undisputed that [the defendant] was a law enforcement officer at the [relevant time] . . . . The first element is, therefore, satisfied.").

Hess also satisfies the second element because he engaged in law enforcement duties while investigating and apprehending plaintiff. *See Cranman*, 792 So.2d at 405 ("arresting or attempting to arrest persons" included within actions garnering immunity); *House v. State*, 380 So. 2d 940, 941 (Ala. 1979) (holding that for immunity purposes law enforcement duties include the "detection and apprehension of criminals").

Hess also satisfies the third element, as he was exercising judgment or discretion in investigating the 911 call and arresting Fuqua. Enforcement of the criminal laws qualifies as a discretionary function. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11th Cir. 2010) ("Police investigations and arrests usually are considered 'discretionary function[s] within the line and scope of . . . law enforcement duties' for the purposes of discretionary-function immunity.") (quoting *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078–79 (Ala. 2005)); *Sheth v. Webster*, 145 F.3d 1231, 1238–39 (11th Cir. 1998) (police officers' use of force and arrest of plaintiff qualify as discretionary functions under Alabama law).

However, Fuqua contends Hess acted in derogation of law or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. As reflected previously, Fuqua bears the burden of establishing this exception to state agent immunity. *See Brown*, 608 F.3d at 741.

Because the court previously determined in the federal qualified immunity analysis that Hess sustained arguable probable cause to arrest Fuqua for disorderly conduct, Fuqua cannot satisfy his burden as to his false arrest and false imprisonment claims. A false arrest claim requires proof "'the defendant caused [plaintiff] to be arrested without probable cause.'" *Ex parte Harris*, 216 So. 3d 1201, 1213 (Ala. 2016) (quoting *Walker v. City of Huntsville*, 62 So. 3d 474, 493 (Ala. 2010)). As described previously, "'probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Harris*, 216 So.3d at 1213 (quoting *Walker*, 62 So.3d at 492) (internal alteration omitted). Thus, "'for a detention to be valid, the officer must reasonably, and in good faith, suspect the individual detained of being involved in some form of criminality.'" *Harris,* 216 So.3d at 1213 (quoting *Walker*, 62 So.3d at 493) (internal alteration omitted). Establishing "probable cause does not require evidence or information sufficient to support a conviction." *Harris*, 216 So.3d at 1213 (citing *Dixon v. State*, 588 So.2d 903 (Ala. 1991)).

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6–5–170. A false arrest will support a claim for false imprisonment. *Harris*, 216 So.3d at 1213 (citing *Upshaw v. McArdle*, 650 So.2d 875 (Ala. 1994)).

Notably, the Alabama Supreme Court applies the same arguable probable cause standard elucidated earlier in determining whether an officer receives state-agent immunity for his role in an arrest. *Brown*, 608 F.3d at 741 (citing *Borders v. City of Huntsville*, 875 So.2d 1168, 1180 (Ala. 2003); *see also Harris*, 216 So.3d at 1213 ("Arguable probable cause exists 'when an officer makes an arrest lacking probable cause if officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed.'") (quoting *Borders*, 875 So.2d at 1179); (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). That is, establishing arguable probable cause for an arrest and detention forestalls a finding that a defendant-officer acted willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken interpretation of the law. "Whether a police officer possesses probable cause or arguable probable cause to arrest an individual depends on the elements of the alleged offense and the operative set of facts." *Harris*, 216 So.3d at 1213 (citing *Brown*, 608 F.3d at 735).

As held above, Hess receives qualified immunity for his conduct in arresting Fuqua because the facts, construed in the light most favorable to Fuqua, demonstrate

Hess possessed arguable probable cause to arrest Fuqua for disorderly conduct.  Hess thus receives state-agent immunity from Fuqua's false arrest and false imprisonment claims.  *See Brown*, 608 F.3d at 741-42.

The assault and battery claim garners a different outcome.  A battery occurs when: (1) the defendant touched the plaintiff; (2) the defendant intended to touch the plaintiff; and (3) the touching was conducted in a harmful or offensive manner.  *Wood v. Cowart Enters., Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001) (citation omitted).  "A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another."  *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).[18]

---

[18] Most Alabama court decisions lump assault and battery claims together.  *See, e.g., Hinson v. Holt*, 776 So. 2d 804, 810 (Ala. Civ. App. 1998) ("At common law, 'any touching by one person of the person of another in rudeness or in anger is an assault and battery.'") (quoting *Seigel v. Long*, 53 So. 753, 754 (Ala. 1910) (citing *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986)).  However, there exists a conceptual distinction.  A person commits an assault by "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented."  *Wood v. Cowart Enters., Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001) (citations omitted).  Yet, one may commit an assault without committing a battery, and vice versa.  *See* Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 38 (2d ed. June 2018 Update) ("Newspapers and even judges and lawyers sometimes use the term assault to mean a battery.  More technically, assault is a quite different tort, although it often precedes a battery. . . .  [I]f the plaintiff apprehends that she is about to be battered, her assault claim is in no way diminished by the fact that the battery was completed and that she also has a claim for that.  On the other hand, if the plaintiff never apprehended that a battery was forthcoming, the defendant may be liable for a battery but not an assault.") (footnotes omitted).

39

As for the second tasing, Fuqua has not proffered sufficient evidence that Hess acted willfully, maliciously, or in bad faith. Rather, Hess used his taser to gain Fuqua's compliance with commands to put his hands behind his back to allow the officers to place handcuffs on him.

However, the denial of summary judgment on the Fourth Amendment excessive force claim as to the first tasing likewise commands a jury trial on the assault and battery claim, particularly whether Hess acted willfully, maliciously, or in bad faith in tasing Fuqua the first time. *See Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996) ("Because the record indicates that a fact question was presented as to whether Wright used excessive and illegal force in arresting Wynn, we cannot agree that the doctrine of discretionary

---

Pursuant to the foregoing standard, no reasonable juror can find that Hess assaulted Fuqua. Taking the facts in the light most favorable to Fuqua, he did not have any indication Hess intended to tase him the first time. As reflected previously, Fuqua asserts the tasing occurred without any warning. Therefore, Fuqua could not have formed a "well-founded fear of an imminent battery" based upon those assertions because he did not perceive Hess's attempt to use the taser before actual deployment. *See* Restatement (Second) of Torts § 22 (1965) ("An attempt to inflict a harmful or offensive contact or to cause an apprehension of such contact does not make the actor liable for an assault if the other does not become aware of the attempt before it is terminated.").

To the extent the second and threatened third tasing could constitute an assault, Hess enjoys state agent immunity because no reasonable juror could conclude Hess acted willfully, maliciously, or out of bad faith given the previous findings Hess administered the second tasing, or threatened the third tasing, due to Fuqua's non-compliance with directives.

Nevertheless, as discussed, Alabama decisions link assault and battery claims together, presumably because "an attempt to commit a battery will establish an assault, [and thus,] every battery necessarily includes an assault because a battery is the very consummation of the assault." 6 Am. Jur. 2d Assault and Battery § 3 (citing *Lakin v. Rund*, 896 N.W.2d 76 (Mich. App. Ct. 2016), *appeal denied*, 894 N.W.2d 53 (Mich. 2017)). Although this conclusion may be logically incoherent if a victim fails to discern an imminent battery, the undersigned will proceed with the accepted designation of the claim as "assault and battery" as the distinction does not affect any substantive outcomes.

function immunity precludes Wynn's assault and battery claim."), *abrogation on other grounds implicitly recognized in Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005)); *see also Jones v. Daniel*, 41 So. 2d 627, 629 (Ala. Ct. App. 1949) ("The duty thus imposed on the officers to make the arrest did not arm them with the right to use more force than was reasonably necessary to accomplish this purpose.") (citing *Evans v. Walker*, 187 So. 189 (Ala. 1939); *Patterson v. State*, 8 So. 756 (1891)).

Furthermore, Fuqua testified that he encountered Hess at a convenience store approximately two months before the events at issue. Hess approached Fuqua about leaving a child in a car outside the store and gave him a warning, and Fuqua claims Hess told him to stay out of Sheffield. These facts may indicate Hess's first use of the taser constituted willful, malicious, or bad faith conduct based upon the prior interaction. Therefore, the assault and battery claim will proceed to trial.

## CONCLUSION

Based on the foregoing analyses, the court **GRANTS** Hess's Motion for Summary Judgment as to Fuqua's 42 U.S.C. § 1983 unlawful seizure and false arrest claims, his § 1983 excessive force claim as to the second tasing, and his state law false arrest and false imprisonment claims. The court **DENIES** Hess's Motion for Summary Judgment as to Fuqua's § 1983 excessive force claim as to the first tasing and his associated state law assault and battery claim.

**DONE** and **ORDERED** this 5th day of February, 2019.

H. Johnson, Jr.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE